We'll now take up 22-7027 U.S. v. Budder. May it please the Court. My name is Jim Castle. I appear here on behalf of Jeriah Budder, who has stand convicted at this time. The District Court's retroactive application occurred in a manner that abolished a complete affirmative defense of justification under state law that was in effect at the time and place of Budder's actions, violated due process because of criminalized conduct that a unanimous jury found was justifiable and thus innocent when it occurred. We see that there are three central issues. First, McGirt was not merely a procedural decision. It was one which had significant substantive implications. Second, this Court's state decision in Murphy v. Royal did not put Budder on fair notice that federal law was in effect in the Cherokee Nation prior to the McGirt decision. Third, the Court's due process concepts of notice foreseeability, and in particular the right to fair warning, require Budder's conviction to be vacant. Let me ask you about Murphy because we have lots of case law that says we hold defendants to a pretty knowledgeable standard of what's going on out in the law. And Murphy, I think, was decided two years before this crime, if I'm right. Yeah. And it pretty clearly talked about the failure to de-establish the reservation. And it talked about that state law would not apply and it would be federal law. So there was certainly out there in the world that there was a debate about jurisdiction with respect to major crimes in areas that had traditionally been reservations. Would you agree with that much? I think there was a debate, yes. And we've said if there's a debate, even if you don't know how it's going to come out, it's enough to put you on notice. Well, I agree. But the debate that was set forth in Murphy v. Royal was the debate on whether the Creek Nation was a reservation. It specifically limited that ruling to the confines of the Creek Nation. And it also interpreted not just a treaty, but it looked into factual matters in determining that the Creek Nation was a reservation, therefore subject to federal law. It wasn't until 2021, two years after the actions in this case, that it was decided even by state law that the Cherokee Nation, which is where these events took place, was subject to federal law. So it's our position that Murphy did not give notice to a different set of individuals at a different location. It was stayed at the time. The mandate had not been issued. I know this court in the Patterson case, a recent case last year, indicated that even the Tenth Circuit wasn't clear as to whether a decision that was not subject to a mandate, when a mandate did not issue it, was to be binding law. There is older decisions that say when a decision stayed, such as Murphy v. Royal was, is that it maintained the status quo. But here the issue is notice, is it not? Not the formality of whether it was the mandate it issued or whether it was binding precedent. Isn't that correct? Absolutely. So in terms of notice, after Murphy's handed down, what was the reasonable argument that could be made that Murphy didn't apply to other nations within Arizona, within Oklahoma? Well, the wording of McGirt, actually, there was a debate even in McGirt that the dissent suggested it wasn't applicable to the other four tribes. It footnoted some of the dissent, but Justice Gorsuch, in writing the majority opinion, specifically rejected that and indicated we are not deciding whether our decision today in McGirt applies to these four tribes. That's par for the course. You don't decide cases that are not presented to you. What was to be reasonable to say that someone could rely on the pre-Murphy law to distinguish some other reservation in Oklahoma? What was the argument that could be made? What was the reasonable argument that, well, the way the treaties worked with these other Indian nations, we don't think Murphy should apply here? Because everybody caved, essentially, when the issue came up, which makes me think there wasn't a good argument, but if there was a good argument, maybe that relates to reliance. I don't believe there was a good argument. Okay, so then why was it, so wouldn't anyone then know, after Murphy, that this was a matter of debate for all of the tribes? Well, you probably have to know, Mr. Butter or a reasonable person in his shoes would have to know, that even though there wasn't a decision, it said that he was on federal land, but there was some decision in a different place in Oklahoma that didn't have the binding effect of law. He has to then predict that it's going to be a binding law at some point when the Supreme Court is going to agree with the Tenth Circuit. You have to make all those predictions to be able to put on notice. Well, I thought you agreed with Judge McHugh when she said the test was whether it was a debatable proposition. It certainly became debatable after Murphy was handed down, didn't it? You couldn't say, you know, Murphy could have been reversed by the Supreme Court. Right, I do believe it's debatable, but that's not the issue that I believe gives fairness. Fairness is looking at whether it's an expected decision. Whether it was expected, I'm sorry. Well, you're taking issue with our precedent, because our precedent is debatable. You know, the whole concept of the due process analysis is assuming that before someone commits a crime, they get on Westlaw and they search around and they educate themselves about legal debates. I mean, the whole thing is a fiction. But what the standard is, is whether if, in fact, somebody did that, it would be debatable. Well, I take issue with the debatable concept. I believe that the law has set forth a laminar versus California, is that there has to be proof of a probability that you'd be on notice, that your criminal conduct was illegal and subject to particular laws. There has to be some level of probability. Okay, so if you can't think of any reason to distinguish among the various different tribes in Oklahoma, then I would think it would be a probability, unless you're saying we don't think the Supreme Court's going to affirm the decision in Murphy. Well, I think there was a probability once McGirt came down. At the point in time that both McGirt and Murphy v. Royal were up, it was under the case of Sharp v. Royal, or Murphy v. Sharp. Both of them, the underlying decisions were in opposition. So the McGirt State of Oklahoma Court of Criminal Appeals had decided that it was Oklahoma land. The state decision in Murphy v. Royal said it was Indian land, and then four other federal jurisdictions. And which of those two jurisdictions would have the last word in this? The U.S. Supreme Court. Well, between federal and state. If he's convicted in state court and then seeks relief in habeas, which is what happened in Murphy, as I recall, then it would be the Tenth Circuit decision that would prevail in that circumstance. It would be the Tenth Circuit or the Supreme Court because of the supremacy clause. But at the time that this happened, the court had stayed its decision. And the state decision makes it, the status quo is in effect. In fact, the motion for stay indicated in Murphy that the reason they wanted to have a stay was so they wouldn't have to change the criminal justice standards in the state of Oklahoma until such time as the Supreme Court entered its decision. And in fact, the boots on the ground continue to apply Oklahoma law. The U.S. Attorney's Office that appears here today was not prosecuting people under federal law during this time period pending a decision in Murphy. Let me, let me, I'm afraid you're going to run out of time, and there's a second prong to our due process analysis, which is whether your client has been prejudiced by this, by the exercise of the federal jurisdiction here. And one of the, and you rely on, there was a special interrogatory given to the jury. And one of the problems that I have is I don't think that's a complete statement of Oklahoma law. So I don't really know what to do with it because Oklahoma doesn't allow, if somebody is going to punch me in the face, I can't shoot them dead if it's excessive for what the risk was to me. And there was no concept of proportionality that was put before the jury in that instruction. So I don't know really how it helps us to tell whether he would have prevailed in Oklahoma. Well, Your Honor, I believe that the government's briefing conflates different variations of self-defense. There's many different ways that you can assert self-defense in Oklahoma. For example, their make-my-day essential harm self-defense doesn't require you to feel a level of proportionality. You're allowed to use deadly physical force if someone is breaking into your home. And this particular section that we're talking about doesn't require that kind of weighing that the court is talking about. That's for a different section of self-defense law. So if someone's committing a forcible felony on me in Oklahoma, irrespective of what that felony is, I can kill them. That's true. And there's no concept at all of proportionality and reasonableness in the level of force I use to defend myself or another. Well, the instruction is specific. It comes right from the Oklahoma statutes. And it states that if you have a reasonable belief that someone's committing or attempting to commit a forcible felony against you, you may use deadly physical force. We may not agree with that, Your Honor, as individuals, but that's the state of the law in Oklahoma. And it doesn't require any of the elements that the government has set forth in different statutes dealing with different kinds of self-defense. If the court doesn't have any other question on that, I would like to leave the remaining time for my colleague. Oh, sure. Yeah, you're not talking about serving for rebuttal, you and your colleague just speaking. Oh, I mean for rebuttal, yes, for rebuttal. Oh, OK, OK. I'm sorry. OK, doesn't matter. May it please the court, my name is Linda Eberle. I represent the United States. The first sentence of the McGirt opinion states that at the far end of the Trail of Tears was a promise. McGirt did not, by its terms in that first sentence, apply only to the Caribbean Nation. In fact, Tahlequah, where this event happened, was the end of the Trail of Tears for the Caribbean Nation. Well, McGirt was decided after this crown, right? That's correct. So it's not helpful on due process issue, is it? The exact language I quoted may not be. That language I quoted was more to argue that the way that all five tribes are treated could have been foreseen, as the court previously indicated. Well, it would have to be foreseeable for something to happen before the crown. Because in Murphy v. Royal in 2017, since that time, the people in northeastern Oklahoma certainly had been on alert that a ruling may come down that says all of that part of Oklahoma is Indian country. So what, I mean, if we can drill down a little more specifically, I mean, what do you have that they were on notice, that it was debatable whether they were going to be subject to federal jurisdiction? Your Honor, we have the long spring side of cases in the McGirt opinion. Rather than citing them all for you here. Wait, McGirt again? Yes, Your Honor. I'm just trying to do my part. I just don't know that McGirt helps you at all on the due process issue. Anything that was said in McGirt, this defendant had already committed his crime and allegedly thought he'd be charged under Oklahoma law, where he didn't have any proportionality requirement on self-defense. I'm just, Your Honor, I'm simply trying to point out that in the McGirt opinion and in our brief, we have long spring sides with the history, some history of the challenging of whether or not East Oklahoma was Indian country. That's factor one that should have provided foreseeability. OK. So you're saying that the cases you cited were from like Murphy era cases before the crime was committed that would have put people on notice that this was an issue. That is a possibility. That is a possibility. There's also the fact that this defendant, even before Murphy, even before McGirt, could not walk around the city of Talapaw with the belief he was unquestionably on state land for years. I mean, there's portions of Talapaw that may be in trust land, where an Indian casino is, that may be restricted allotments, the restrictions for which had not been lifted, that may be dependent Indian communities. And this court has litigated those. So to say that he had no idea he could have been an Indian country before McGirt or Murphy is just not accurate because he could have been there, maybe not on a reservation, but on other types of Indian country. Is there anything about Murphy that would have alerted someone that it wasn't limited to the Creek Reservation, that the Cherokee area was also in question? In all candor, Your Honor, I do not recall the language of Murphy well enough to state whether or not there was a footnote or some mention. What I can say is that the history that the court goes through in deciding whether or not reservations have been disestablished for any of the five tribes are going to rely at least initially on similar history and on similar statutes that were not asked by Congress to disestablish that reservation. While there may have been some quirks in the early years of statehood regarding restrictions and when they might not be lifted, depending upon whether an LLT was a full blood, three-quarter, half, or less. And those changed by tribe. But otherwise, for all intents and purposes, the five tribes had been treated similarly. And I would submit that anyone in northeastern Oklahoma would know that, just from growing up in that area. Well, the state didn't know it. I mean, the state was prosecuting major crimes in all of that area. And in fact, began the prosecution here. So it apparently wasn't, not everyone apparently understood that, including law-trained people. First of all, Your Honor, my comment that anyone would know, what I'm saying is I think that most people would know it's at least a possibility that if you treat one of the five tribes in a certain way, eventually all of them are going to be treated in that way, if it's a historical question. How the state responded to Murphy, and for all candor, how the federal government responded to Murphy, was an intent to not allow a jurisdictional hold to exist until the issue was finally decided by the Supreme Court. What do you do with the idea that in cases that we've had before us, state officers continued investigations in Indian country, executed warrants in Indian country, all kinds of fun things like that, and then before this court, took the position that they weren't on notice, and we agreed. Yes, Your Honor, and in the Patterson case, that was the correct decision. In fact, it was the decision we argued for. But the facts are very different when you're looking at someone that has committed a federal homicide offense or homicide, committed a homicide, versus an officer whose behavior is being analyzed under the Fourth Amendment Exclusionary Rule. For one thing, they're completely different factual situations. Well, I guess we've said that officers who continued to investigate crimes in Indian country, even though Murphy was out there, in good faith believed they still had jurisdiction. I mean, why wouldn't that be fair for the defense? For the very words Your Honor just used, there's a good faith argument for investigators. We look at whether, in good faith, they relied on their training and their supervisor's instructions. And at that point, in Oklahoma, partially because of the state that was issued on Murphy and the fact that everyone was just trying to figure out a way to make this work, the state was continuing to handle those cases. And the officers in Patterson, in fact, testified. Had they not investigated, they would have been in trouble with their supervisors. But poor Mr. Butter, I mean, he didn't even, he had nothing. He had nothing. You're saying that another reservation might be Indian country after we unstayed the effect of the decision. What Mr. Butter didn't have was good faith. When he got into the car in Tahlequah and loaded the gun in the back seat of that car, there was no good faith. When he refused to get out of the car, when he was twice asked to leave, there was no good faith. Certainly, when he did not take the opportunity to run once he'd shot Mr. Jumper twice and Mr. Jumper backed up, there was no good faith. There certainly wasn't good faith when our victim was laying in the middle of an intersection, alive but bleeding, and the defendants stood over him and fired into him repeatedly. There's no requirement that you have good faith in order to be entitled to due process. That's correct. So the question really here is due process. Let me get to the second prong of our due process analysis. Do you agree with the statement that in Oklahoma, there's no concept of imperfect self-defense if you're defending against a forcible felony? Imperfect self-defense and I believe... Let me, let me, proportionality. Okay, proportionality. Imperfect self-defense would be where I, you know, you come up and you slap me in the face and I shoot you with an AK-47 until you're dead. That would be imperfect self-defense because it is more than necessary to protect myself. I appreciate that, Your Honor. I wanted to make sure I didn't jump off into another part of imperfect self-defense. Proportionality is a part of the Oklahoma self-defense law. And what do you point to on that? Because as I understood the argument, it is that for certain types of acts like home invasion and apparently defending against a forcible felony, there's no limit to the amount of force you can use to protect yourself. If somebody's breaking the glass to enter my home, I can shoot them dead on the porch without even knowing if they're armed. That's just not accurate, Your Honor. Your question is accurate. That assumption is not accurate, that that is all of Oklahoma law. What do I look at to tell me that? The easiest way to look would be to look at the Oklahoma Uniform Criminal Injury Instructions, the WIJs. Had this case been tried in state court, a state court judge with knowledge of Oklahoma law, and it's important, I think, to note here that the judge, the prosecutors, none of the people involved had practiced Oklahoma law, so they may not have been aware of this. But the Oklahoma injury instructions, we call them the WIJs, there's an entire set of self-defense. And one of those is the WIJ 8-55, which provides that the use of excessive force destroys a claim of self-defense. And I believe the commentary adopting that jury instruction indicates that while that jury instruction may be in there for trespassing cases, I think they say that it always destroys a claim of self-defense. We direct this court to pages 15 through 20 of our brief where we have laid out in some detail the variety of instructions that would have been given in a state court that probably would have, had they been provided to this jury, resulted in a different result on that special interrogatory. Secondly, I'd like to put... Let me ask one more question. Did you ask the court to give a instruction that the use of excessive force is destroyed if you are excessive in your defense? No, Your Honor. And is that a problem for you here? I don't believe it is. Both sides were given the opportunity, I'm sure, to submit a proposed interrogatory. The United States chose not to because the United States vigorously and consistently objected to the giving of a special interrogatory in this case because Oklahoma law didn't apply, because the Supreme Court in black indicated that in criminal cases the use of special interrogatories is discouraged. And for those reasons, we did not provide proposed interrogatories, although I can see that the way this has ended up procedurally, it might have been helpful. But at the time, it seemed that we may as well have been providing proposed special interrogatories on the laws of New Hampshire, or New Zealand, for that matter, because the Oklahoma law didn't apply. Federal law applied. And the jury here got the federal self-defense instruction. I'd like to turn briefly to the sentence, and that it is in fact reasonable, because we believe that there was not an acquittal here based on this special interrogatory, but a conviction for voluntary manslaughter and a sentence that was imposed. There is no Eighth Amendment violation because there was no acquittal, and we certainly would argue that for all the reasons we've just discussed as to why federal law applies, the Eighth Amendment argument is without merit. Secondly, the court did describe a rational basis to explain the upward variance granted here, including the opportunity to withdraw, which the defendant ignored, the number of shots that were made, 12 here at least, and defendant's flight immediately afterward, in addition to all of the other 3553A factors. The variance granted was very reasonable. It was in fact within the United States Sentencing Guideline range for the initial determination of that range, and it was only nine months above what the range was 70 to 87 months after the court imposed or allowed two points for acceptance of responsibility despite the fact they went to trial. So therefore, the sentence was 96 months. It was just a nine-month increase at the most, but well-earned under due circumstances by this defendant, and for those reasons, we would ask his support to affirm. Thank you, counsel. May it please the court, Andre Belange on behalf of Mr. Butter. In rebuttal, I would like to point out to the court that the government here is asking to hold Mr. Butter to a standard of fair notice, that is, not ask any other law enforcement entity to hold itself to. The point of the matter is that the federal government could have begun prosecuting cases in federal court in 2019 if it wanted to do so, and it chose not to. In argument, the government suggests that we kept up with this centuries-old status quo in order to not have a hole in the process, and that's fine. You can still have state officers investigating cases, but then you start bringing them into federal court subject to the Major Crimes Act and let defendants litigate that out, and that did not happen here. And so for a year or more, the status quo, the 100-years tradition, remain the same. Cases, including Mr. Butter's, are going to be prosecuted in state court until Montgomery. And we will then just make a little bit of an exception and allow for officers to still rely on that tradition when it comes to protecting themselves, but Mr. Butter will not get that protection. In the minute that I have left, I'd like to talk a little bit about the jury instruction issue. When counsel references the Uniform Pattern Instruction 855, as I appreciate that pattern of instruction, the language applies the trespass and the excessive force commentary. The language applies the trespass on land. When we read into that vehicles, we're doing exactly what the South Carolina Supreme Court did in the Bowie decision in reading into language of a statute that did not exist and tried to then make conduct criminalized. And so I just wanted to bring those two points to the court's attention, and I'll conclude with this. When we were talking about what Mr. Butter did in that car, there is testimony from Larry Thompson, who was the passenger in the backseat at the child safety locks were on, making it a real possibility that Mr. Butter could not get out of the car until the decedent opened the door to let him out when he began his attack on my client. Thank you. Thank you, counsel. The case is submitted. Counselor excused.